## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JANET DONOVAN,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:23-0278** |
| **v.** | : | **(JUDGE MANNION)** |
| **PITTSTON AREA SCHOOL DISTRICT,** | : | |
| | : | |
| **Defendant** | : | |
| | : | |

## MEMORANDUM

Plaintiff Janet Donovan alleges she was retaliated against by her public employer, Pittston Area School District (PASD), because of her political activities and affiliations. PASD now moves to dismiss her complaint. (Doc. 2). For the reasons that follow, the court believes Donovan has alleged enough at this stage to permit a reasonable inference that PASD may be liable for Donovan's core retaliation claims. Thus, the court will **GRANT in part** and **DENY in part** PASD's motion as follows.

## I.   BACKGROUND

The factual background in this matter is taken from the allegations in Donovan's complaint (Doc. 1), which the court must accept as true for purposes of PASD's motion to dismiss.

Donovan avers she has a long, positive history as an employee of PASD. However, despite her lack of any disciplinary history or issues with PASD, at least since 2011, she has been repeatedly discriminated against to the point where any reasonable person in her position would have felt compelled to resign. Donovan was the Director of Curriculum at PASD since 2014 until the incident in 2019 at issue in this case.

By way of background, in March 2019, the teacher's contract with PASD was being negotiated, and was not yet finalized. Also, in late March 2019, Donovan and other individuals were invited to a meeting at the home of a PASD employee regarding the pending 2019 teacher's contract (the "March meeting"). At the same time, there was a contentious municipal election for School Board in May 2019 wherein one of the paraprofessionals, a teacher's aide, was the campaign manager for a prominent school board candidate. (The paraprofessional / teacher's aide / campaign manager is referenced in Donovan's complaint as "Person A"). Person A was part of the March meeting, as were Donovan and a few others.

The PASD and their agents were aware of Donovan's association with the teachers, employees and Person A, and the fact that those same teachers and employees were actively opposed to the pending teachers' union contract being approved. In fact, the PASD candidate, Person A and

others around the same time, were participating in "Facebook Live" events regarding these PASD issues. Thus, Donovan avers, PASD and its agents were acutely aware of the political associations of Person A, Donovan and other teachers or aides.

After the March meeting, Person A made a packet of information with information for all teachers affected by the forthcoming contract. This packet of information was prepared, copied and disseminated by Person A, only, without the knowledge of Donovan, at the Pittston Area Primary Center in April 2019. One of the documents included in the disseminated packet by Person A allegedly had salaries, raises, and social security numbers of the affected administrators. In April 2019, numerous questions arose regarding origination of the dissemination of the document with this confidential information. However, the only administrator who was singled out for the alleged dissemination of the confidential information was Donovan. Donovan avers she was singled out by PASD—specifically, by Superintendent Kevin Booth—because she was associating with the teachers and employees who were union members who were potentially going to vote on the new teacher's contract.

Because of this association, Booth allegedly instituted a policy to dispatch school resource officers to conduct non-confidential interviews of

- 3 -

PASD teachers and staff and attempt to identify the source of the dissemination of confidential information. But the only administrator interviewed was Donovan, and Donovan had nothing to do with the dissemination of the confidential information (Person A, who actually did disseminate the confidential information, was criminally charged and is no longer employed at the PASD).

This, again, was because PASD and its investigators were aware that Donovan had associated with and continued to associate with individuals who were against the teacher's union contract and who were trying to lobby support for voting against it. In early May 2019, Donovan contacted Frank Serino, the PASD School Board President, to ask what was going on, as Donovan was unaware what the PASD was concerned about. Mr. Serino refused to return the call to Donovan, leaving her in the dark as to what alleged concerns the PASD had.

PASD proceeded to blow up (so to speak) the investigation into Donovan at Booth's direction, forcing over 40 interviews. None of the interviewees were able to identify Donovan as the source of the leak of the confidential information. PSAD continued to use this series of events and Donovan's political involvement as the basis to retaliate against her. PASD, at the direction of Booth and school resource officers, threatened criminal

charges against Donovan—going so far as to file charges and then voluntarily withdraw them in an effort to involuntarily coerce Donovan to leave the PASD and to place her under duress. Moreover, PASD, at the direction of Booth and through the school resource officers, made statements to teachers and employees whom they interviewed which stated that Donovan was the target of the investigation. Then PASD, through the school resource officers and the superintendent, teachers and employees, asked Donovan if she was going to resign under the circumstances. Donovan avers this was a direct attempt to intimidate Donovan into resigning. Donovan had no intention of resigning as she did not do what the PASD had accused her of doing.

The investigation into Donovan culminated on July 23, 2019, when Booth sent Donovan a letter of suspension with pay, claiming that "information received at this time establishes a reasonable belief that . . . you intentionally or recklessly caused the social security numbers of twenty-four employees of the Pittston Area School District to be disclosed and published to numerous individuals . . . ." Further, even though the PASD had suspended Donovan, as of August 8, 2019, the PASD admitted that it had not completed the interviews and/or any investigation. The PASD refused to

- 5 -

produce evidence of their findings against Donovan, despite requests for the same.

Donovan also avers that between March and June of 2019, one of the school resource officers was alerted by a senior employee in the IT department that allegedly leaked confidential information was already available to the any PASD employee as a result of a PASD internal coding issue. It was confirmed that this information was available and not protected by the PASD, yet the PASD did nothing with that information and still pursued Donovan.

On August 22, 2019, the PASD submitted a demand for resolution requiring an immediate resignation by Donovan, with no other alternative, except potential termination. Donovan says she intended to continue to work, with the hopes of yet another attempt at sabotaging her career being put behind her. However, on September 8, 2019, the PASD, this time through counsel at the direction of the superintendent, threatened that the PASD was going to again file charges against her. The PASD was notified that she was having substantial medical issues. Nonetheless, the PASD advised Donovan that her suspension with pay was going to be converted to suspension without pay. As a result, Donovan has, for the first time in her life, been diagnosed with major depression disorder, anxiety and anemia, and has

been on medication since that time in 2019. Donovan was forced to seek and was immediately referred to obtain psychiatric counselling.

Due to the constant threats from PASD, Donovan avers she had no choice or alternative but to resign her position and end her career, which she did on September 27, 2019, through a letter to the PASD and its superintendent.

## II.   LEGAL STANDARD

PASD's motion to dismiss is brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the complaint fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005), and dismissal is appropriate only if, accepting all the facts alleged in the complaint as true, the non-moving party has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (abrogating "no set of facts" language found in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The facts alleged must be sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. This requirement "calls for enough fact[s]

- 7 -

to raise a reasonable expectation that discovery will reveal evidence of"
necessary elements of the non-moving party's cause of action. *Id.*
Furthermore, to satisfy federal pleading requirements, the non-moving party
must "provide the grounds of his entitlement to relief," which "requires more
than labels and conclusions, and a formulaic recitation of the elements of a
cause of action will not do." *Phillips v. County of Allegheny*, 515 F.3d 224,
231 (3d Cir. 2008) (brackets and quotations marks omitted) (quoting
*Twombly*, 550 U.S. 544 at 555).

    In considering a motion to dismiss, the court generally relies on the
complaint, attached exhibits, and matters of public record. *See Sands v.
McCormick*, 502 F.3d 263 (3d Cir. 2007). The court may also consider
"undisputedly authentic document[s] that a defendant attaches as an exhibit
to a motion to dismiss if the plaintiff's claims are based on the [attached]
documents." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d
1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are
alleged in the complaint and whose authenticity no party questions, but which
are not physically attached to the pleading, may be considered." *Pryor v.
Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002). However,
the court may not rely on other parts of the record in determining a motion to

dismiss. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).

The court should generally grant leave to amend a pleading before dismissing it as merely deficient. *See, e.g.*, *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007); *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Shane v. Fauver*, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004).

## III.   DISCUSSION

### A.   *Monell* Claims against School District

PASD first argues that all of Donovan's 42 U.S.C. §1983 claims against it must be dismissed under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978). A municipality, like PASD, may be held liable pursuant to §1983 only if a plaintiff is able to identify a policy or custom that caused a constitutional violation. *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 761 (3d Cir. 2019).

> That requires a plaintiff to show, for a policy, that an official with final decision-making authority has "issue[d] an official proclamation, policy, or edict," *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990), or, for a custom, that a course of

> conduct, though not authorized by law, was "'so permanent and well settled' as to virtually constitute law," *id.* (quoting *Monell*, 436 U.S. at 690, 98 S.Ct. 2018). In either case, the policymaker, as defined under state law, must be "responsible either for the policy or, through acquiescence, for the custom." *Andrews*, 895 F.2d at 1480–81.

*Id.* PASD argues Donovan's "[c]omplaint is devoid of any facts to establish a policy, custom, or practice to support *Monell* liability." (Doc. 5). Donovan, however, alleges in her complaint that the allegedly pretextual, quasi-criminal investigation into her was conducted at the direction of Superintendent Kevin Booth, whom Donovan alleges "has the final policy-making authority such that his conduct represents the official policy of the PASD with regard to the actions against Donovan." (Doc. 1). If true, Booth's official actions can constitute a policy for purposes of PASD's *Monell* liability. Other than arguing Donovan has not alleged enough facts in this regard, PASD has failed to meet its burden to demonstrate that Donovan failed to state a plausible *Monell* claim based on Superintendent Booth's conduct. Accordingly, the court will deny the motion to dismiss on this ground. Whether Donovan has alleged an underlying constitutional violation to hold PASD liable for Booth's alleged official conduct is discussed below.

## B. First Amendment Retaliation

To prevail on a First Amendment retaliation claim under 42 U.S.C. §1983, a plaintiff must prove that "(1) [s]he engaged in 'constitutionally

protected conduct,' (2) the defendant engaged in 'retaliatory action sufficient to deter a person of ordinary firmness from exercising [her] constitutional rights,' and (3) 'a causal link [existed] between the constitutionally protected conduct and the retaliatory action.'" *Baloga*, 927 F.3d at 752 (quoting *Palardy v. Twp. of Millburn*, 906 F.3d 76, 80–81 (3d Cir. 2018)). PASD says Donovan has failed to allege all three elements. "The first element of the analysis requires a legal determination; the remaining steps present questions for the fact finder." *Id.* at 752 n.7.

A public employee engages in constitutionally protected conduct when she (1) speaks (or associates) as a citizen; (2) the statement (or association) involved a matter of public concern; and (3) the government employer did not have "an adequate justification for treating the employee differently from any other member of the general public" based on its needs as an employer. *Id.* at 753. PASD argues Donovan did not engage in protected speech, and that her conduct otherwise does not touch a matter of public concern. The court agrees with the former argument but not the latter.

First, the court agrees Donovan does not allege she engaged in any protected speech. The complaint is premised on her association with union members, teachers, and a political candidate who opposed the teacher's contract. The only allegation that somewhat resembles "speech" is the

allegations that Donovan "associated with . . . individuals who . . . were trying to lobby support for voting against [the teacher's contract]." (Doc. 1 at 11). But even that allegation does not suggest Donovan herself did any lobbying, but merely associated with those who did. Thus, to the extent Donovan's First Amendment claims are premised on protected speech, those claims will be dismissed without prejudice.

The court finds, however, that Donovan has alleged enough at this stage to nudge her associational claim into the realm of political association protected by the First Amendment. The allegations are sufficient in this regard on two complimentary grounds. First, the complaint can be fairly read to suggest Donovan was retaliated against for her support (by association) of a school board candidate in the heat of a local election—a candidate that Donovan alleges was ultimately unsuccessful. *See generally Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir. 1987) ("a citizen's right not to support a candidate is every bit as protected as his right to support one"). Second, the complaint alleges PASD retaliated against Donovan for her association with those advocating against the pending teacher's contract—an apparent hot-button issue in the school board election as evidenced by the alleged "Facebook Live" events regarding the issue. The teacher's contract apparently playing a significant role in the pending election, it could fairly be

said to be a matter of public concern. Indeed, similar collective bargaining and contract negotiations have been held to touch matters of public concern. *See, e.g., Gregorich v. Lund*, 54 F.3d 410, 416 (7th Cir. 1995) (finding plaintiff's union-organizing effort involved a matter of public concern where it aimed to effectuate a change in employer policy that would benefit plaintiff and his co-workers); *Justice v. Danberg*, 571 F.Supp.2d 602, 610–11 (D. Del. 2008) (finding "collective bargaining and contract negotiations concerning working conditions of correctional officers in the state prison system is of considerable concern to the community"); *Meagher v. Andover Sch. Comm.*, 94 F.Supp.3d 21, 40 (D. Mass. 2015) (teachers' collective bargaining agreement negotiations touched matter of public concern). Should PASD uncover evidence in discovery showing the teacher's contract did not, in fact, concern the PASD community, it is free to raise its public concern argument again in a future motion.

Next, PASD argues Donovan has failed to allege an adverse action "sufficient to deter a person of ordinary firmness from exercising [her] constitutional rights." *See Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000). The court is not persuaded. A public employer "adversely affects an employee's First Amendment rights when it refuses to rehire an employee because of the exercise of those rights or when it makes decisions, which

- 13 -

relate to promotion, transfer, recall and hiring, based on the exercise of an employee's First Amendment rights." *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003) (citation omitted). Here, Donovan alleges she was suspended with pay, then eventually without pay. She also avers that the allegedly pretextual quasi-criminal investigation into supposed leaking of confidential information culminated in PASD effectively presenting Donovan with two choices: resign or face criminal prosecution. This alleged "constructive discharge," is sufficient to plead an adverse action under the second First Amendment retaliation element.

Next, PASD argues Donovan failed to plead a causal link between her First Amendment association and adverse employment action. For that element, the plaintiff must "show that the protected activity was a substantial or motivating factor in the alleged retaliatory action." *Id.* (citation omitted). Specifically, PASD argues the time difference between Donovan's attendance at the March 2019 meeting and her July 2019 suspension is not "unusually suggestive of retaliatory motive," as required to establish causation. *See Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003). The court again believes Donovan has pleaded enough at this stage. While Donovan was allegedly suspended in July 2019, the complaint, read in the light most favorable to Donovan, suggests the alleged pretextual

- 14 -

investigation into her started much before that date. Moreover, Donovan alleges PASD knew by June 2019, at the latest, that the confidential information that was allegedly leaked was widely available to any PASD, yet PASD continued to pursue Donovan. In light of these allegations, and the fact that the causation inquiry is fact-intensive and could benefit from further factual development, the court finds Donovan has pleaded enough to infer a causal link.

And thus, the court will deny PASD's motion to dismiss Donovan's First Amendment Claim. The court will also deny PASD's motion to dismiss Donovan's politically motivated constructive discharge claim in Count III of her complaint, which has substantially similar elements to her First Amendment claim, for the reasons delineated above. *See Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir. 1997) ("To make out a *prima facie* case, public employees who claim that they suffered from an adverse employment action based on their exercise of a constitutional right must show that they worked for a public agency in a position that does not require a political affiliation, that they were engaged in constitutionally protected conduct, and that the conduct was a substantial or motivating factor in the government's employment decision.").

Finally, the court will dismiss with prejudice Donovan's Count II "Fourteenth Amendment Retaliation Claim Freedom of Speech/Petition." (Doc. 1). The allegations in this claim are a replica of the Count I First Amendment claim. And, if Donovan is trying to bring this claim under the substantive due process clause of the Fourteenth Amendment, "[t]he Supreme Court has made clear that [w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Dennison v. Pennsylvania Dep't of Corr.*, 268 F. Supp. 2d 387, 400–01 (M.D. Pa. 2003) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)) (internal quotation marks omitted). Donavon's claim in Count II, then, is duplicative of her Count I claim and will thus be dismissed with prejudice.

## C.   Procedural Due Process: Deprivation of Liberty Interest

PASD next seeks dismissal of Donovan's procedural due process claim under the Fourteenth Amendment for a deprivation of her liberty interest in her reputation.[1] "[T]o make out a due process claim for deprivation

---

[1] Donovan also pleads this claim under the First Amendment and Fifth Amendment. A procedural due process claim is properly grounded in the Fourteenth Amendment, however, and will be construed as such.

of a liberty interest in reputation, a plaintiff must show a stigma to his

reputation plus deprivation of some additional right or interest." *Hill v.*

*Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (citations omitted).

The Third Circuit refers to this as the "stigma-plus" test. *Id.* (citation omitted).

> In the public employment context, the "stigma-plus" test has been
> applied to mean that when an employer "creates and
> disseminates a false and defamatory impression about the
> employee in connection with his termination," it deprives the
> employee of a protected liberty interest. *Codd v. Velger*, 429 U.S.
> 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). The creation and
> dissemination of a false and defamatory impression is the
> "stigma," and the termination is the "plus."

*Id.* The purportedly stigmatizing statements must be made publicly and must

be false. *Id.*

Here, Donovan alleges PASD, through Superintendent Booth and

school resource officers, stated publicly that Donovan disseminated private

information and, as a result, would have to resign or face criminal charges.

The statements regarding Donovan's alleged criminal conduct were false,

Donovan alleges. These allegations are sufficient to permit a reasonable

inference as to the "stigma" prong of Donovan's deprivation of liberty claim.

The school district seeks greater detail in these alleged false statements—

*e.g.,* the nature of the statements, and how they were made or published.

(Doc. 13). But that level of specificity not required to survive a motion to

dismiss; Donovan's allegations are sufficient at this stage to put the school

district on notice of her reputational interest claim. Fed. R. Civ. P. 8. Furthermore, these statements were allegedly made in connection with Donovan's constructive discharge. An alleged loss of public employment can meet the "plus" prong." *Hill*, 455 F.3d at 236. Accordingly, the court finds Donovan has alleged enough at this stage to move forward with her procedural due process claim on the basis of a deprivation of her liberty interest in her reputation.

## IV.   CONCLUSION

In light of the foregoing, the court will **GRANT in part** and **DENY in part** PASD's motion to dismiss. (Doc. 2). The motion will be **GRANTED** with regard to Donovan's Fourteenth Amendment Claim in Count II, and her First Amendment Claims based on alleged protected speech. The motion will be **DENIED** in all other respects.  An appropriate order follows.

**MALACHY E. MANNION**
**United States District Judge**

**DATE: September 30, 2023**
23-0278-01

- 18 -